RECORD NO. 14-1454

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

—————————————

JONES LANG LASALLE AMERICAS, INC.,

Plaintiff - Appellant

v.

HOFFMAN FAMILY, LLC, *et al*.,

Defendants – Appellees

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA (Alexandria Division)
Civil Action No. 1:13-cv-01011-AJT-JFA

—————————————

**Brief of Appellees**

—————————————

Jodie N. Herrmann
MCGUIREWOODS LLP
Fifth Third Center
201 North Tryon Street
Suite 3000
Charlotte, North Carolina 28202
Tel: (704) 343-2000

John D. Adams
Brian D. Schmalzbach*
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
Tel: (804) 775-1000
*Not admitted in Virginia

October 27, 2014

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  14-1454        Caption:  Jones Lang Lasalle Americas, Inc. v. Hoffman Family, LLC et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Hoffman Family, LLC and Hoffman Buildings, L.P.

(name of party/amicus)

who are  appellees        , make the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature:    /s/ John D. Adams                    Date:    October 27, 2014

Counsel for:    Hoffman Family, LLC and Hoffman Buildings, L.P.

## CERTIFICATE OF SERVICE
**************************

I certify that on   October 27, 2014   the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ John D. Adams                                         October 27, 2104
(signature)                                                        (date)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

ISSUE PRESENTED ..............................................................................3

STATEMENT OF THE CASE...................................................................3

1.  JLLA hires Arthur Turowski for its government leasing team ......................3

2.  Turowski lays the groundwork for the National Science Foundation lease ..................................................................5

3.  Turowski responds to GSA's first solicitation for expressions of interest in the National Science Foundation lease...........................................6

4.  Turowski counsels Hoffman how to respond to GSA's second solicitation for expressions of interest.................................................7

5.  Turowski prepares and signs Hoffman's response to GSA's Request for Lease Proposal ................................................8

6.  Turowski prepares and signs Hoffman's response to GSA's Request for Lease Proposal for the Fish & Wildlife Service .......................9

7.  GSA awards the National Science Foundation lease to Hoffman.................10

8.  JLLA files suit ................................................................11

9.  The district court holds that the extensive participation by an unlicensed real estate salesperson bars JLLA's claim...................................11

SUMMARY OF THE ARGUMENT ....................................................15

ARGUMENT ..................................................................................17

I.  The district court correctly held that Virginia law requires Turowski to be licensed as a real estate salesperson...............................17

   A.  Anyone who is employed by a real estate broker "to rent or offer to rent any real estate, or to negotiate leases thereof" in Virginia is a "real estate salesperson" and must be licensed...............17

   B.  The district court rightly held that Virginia's definition of real estate salesperson captures the broad range of activities throughout the leasing process ..........................................19

       1.  "Negotiating leases" begins when the salesperson introduces the parties to the transaction .....................................20

i

2.   "Offering for rent" means advertising that property is available for rent.......................................................24

C.   The district court correctly found, based on undisputed facts, that Turowski acted as a real estate salesperson without a license .....................................................................27

1.   Turowski both offered to rent real estate and negotiated a lease within the meaning of Virginia's licensure laws .............27

2.   The district court properly rejected the argument that Turowski was not a real estate salesperson by judicial admission ...................................................................30

II.   The district court properly followed Virginia law that refuses to enforce brokerage agreements involving unlicensed real estate salespersons..............................................................33

A.   Virginia's strong public policy announced in *Massie* prohibits enforcement of contracts to compensate illegal work by an unlicensed salesperson................................................33

B.   There is no exception to Virginia's public policy against illegal real estate activity for unlicensed salespersons who are employed by licensed firms .........................................35

1.   JLLA's firm license does not excuse Turowski's lack of individual license.................................................35

2.   *Massie* is not limited to contracts that are void *ab initio* ..........37

C.   JLLA provides no persuasive reason to depart from well-established Virginia law ..............................................40

1.   *Massie* is perfectly compatible with the authority of the Virginia Real Estate Board........................................40

2.   There is no thumb on the scales in favor of parties who fulfill bargains by breaking the law ...........................42

3.   Free-floating equitable principles do not support JLLA...........43

CONCLUSION ............................................................46

CERTIFICATE OF COMPLIANCE......................................47

CERTIFICATE OF SERVICE ..........................................48

# TABLE OF AUTHORITIES

**Page(s)**

*Alford v. Raschiatore,*
    63 A.2d 366 (Pa. Super. Ct. 1949) ................................................................. 22

*Bailey v. Bailey,*
    12 Va. Cir. 67 (1987) ................................................................................. 43

*Beaudett v. City of Hampton,*
    775 F.2d 1274 (4th Cir. 1985) ................................................................... 40

*Brener & Lewis, Inc. v. Fawcett Publ'ns, Inc.,*
    90 N.Y.S.2d 853 (N.Y. Sup. Ct. 1949),
    *aff'd* 276 A.D. 994 (N.Y. App. Div. 1950) ............................................. 39

*Certified Realty Co. v. Reddick,*
    456 P.2d 502 (Ore. 1969) ................................................................... 22, 40

*Coldwell Banker Mid Plaza Real Estate Inc. v. Guindi,*
    889 N.Y.S.2d 881 (N.Y. Sup. Ct. 2009) ................................................. 40

*Dow & Condon Inc. v. Brookfield Dev. Corp.,*
    833 A.2d 908 (Conn. 2003) ....................................................................... 39

*Erie R.R. Co. v. Thompkins,*
    304 U.S. 64 (1938) ..................................................................................... 44

*Farragut Baggage & Transfer Co. v. Shadron Realty Inc.,*
    501 P.2d 38 (Ariz. Ct. App. 1972) ........................................................... 39

*Firebaugh v. Hanback,*
    443 S.E.2d 134 (Va. 1994) ........................................................................ 44

*Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty,*
    608 F.3d 183 (4th Cir. 2010) ........................................................ 30, 31, 32

*Grammer v. Skagit Valley Lumber Co.,*
    299 P. 376 (Wash. 1931) .............................................................. 21, 22, 23

*Hancock Co. v. Stephens*,
  14 S.E.2d 332 (Va. 1941) ................................................34, 35

*Harrison & Bates, Inc. v. LSR Corp.*,
  385 S.E.2d 624 (Va. 1989) ......................................34, 41, 42, 44

*Johnson v. United States*,
  559 U.S. 133 (2010).................................................25, 26

*Massie v. Dudley*,
  3 S.E.2d 176 (Va. 1939) .............................................*passim*

*Minter v. Wells Fargo Bank, N.A.*,
  762 F.3d 339 (4th Cir. 2014) ...............................30, 31, 32

*New Amsterdam Cas. Co. v. Waller*,
  323 F.2d 20 (4th Cir. 1963) ..............................................30

*Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*,
  296 F.3d 308 (4th Cir. 2002) ..............................................43

*Rabin v. Prenzler*,
  451 N.E.2d 1331 (Ill. Ct. App. 1983) .........................22, 29

*RDP Dev. Corp. v. Schwartz*,
  657 A.2d 301 (D.C. 1995) ........................................22, 29

*Roman v. Lobe*,
  152 N.E. 461 (N.Y. 1926)..................................................17

*Shaffer v. Beinhorn*,
  213 P. 960 (Cal. 1923)......................................................22

*Shipbuilders Council of Am. v. United States Coast Guard*,
  578 F.3d 234 (4th Cir. 2009) ..............................................24

*Smithy Braedon Co. v. Hadid*
  825 F.2d 787 (4th Cir. 1987) ...............................21, 38, 42

*Thorpe v. Carte*,
  250 A.2d 618 (Md. 1969) ..................................................21

*Wallihan v. Hughes*
82 S.E.2d 553 (Va. 1954) ..................................................................43

*Weathers v. Commonwealth*,
553 S.E.2d 729 (Va. 2001) ...............................................................42

**STATUTES**

Va. Code Ann. § 54.1-2100 ...............................................................18

Va. Code Ann. § 54.1-2101 ........................................................*passim*

Va. Code Ann. § 54.1-2103(A)(7) .....................................................23

Va. Code Ann. § 54.1-2103(C) ..........................................................24

Va. Code Ann. § 54.1-2105 ...............................................................18

Va. Code Ann. § 54.1-2105.1 ............................................................18

Va. Code Ann. § 54.1-2105.3 ............................................................18

Va. Code Ann. § 54.1-2106.1(A) ..............................................19, 35, 36

Va. Code Ann. § 54.1-2106.1(C) .........................................18, 33, 35, 36

Va. Code Ann. § 54.1-2107 ...............................................................18

Va. Code Ann. § 54.1-2110.1(A) ..................................................19, 36

Va. Code Ann. § 54.1-2110.1(B)(3) ..............................................19, 36

Va. Code Ann. § 54.1-2110.1(B)(2)(e) ...........................................19, 36

Va. Code Ann. § 54.1-2133(A)(2) .....................................................27

Va. Code Ann. § 4359(79) (1924) .....................................................40

Va. Code Ann. § 4359(88) (1924) .....................................................41

**OTHER AUTHORITIES**

5 Williston on Contracts § 12:4 (4th ed.) ............................................44

*Historic Hydro Plant For Sale*, Richmond Times-Dispatch, Mar. 6, 2013 ...........26

Restatement (Second) of Contracts § 24 (1981) .................................................. 25

Restatement (Second) of Contracts § 181 (1981) ................................................ 38

Restatement (First) of Contracts § 580 (1932) ................................................... 37

Restatement (First) of Contracts § 598 (1932) ................................................... 44

## INTRODUCTION

Almost one hundred years ago, pervasive abuse by real estate salesmen prompted a national wave of legislative reform. Virginia was no exception. In a series of statutes that have survived with remarkably little substantive change, Virginia mandated that those who serve as real estate brokers and salesmen must be licensed by a real estate board in order to filter out dishonest and incompetent individuals. Early on, the Virginia Supreme Court held that the licensing act had one especially significant consequence: those who flout the law by practicing without a license cannot enforce the contracts under which they perform unlicensed real estate services. *See Massie v. Dudley*, 3 S.E.2d 176 (Va. 1939). In short: no license, no commission.

This case involves an unlicensed real estate salesman named Arthur Turowski. As Senior Vice President of real estate firm Jones Lang LaSalle Americas, Inc. (JLLA), Turowski served as the agent for defendants in their successful quest to lease a large office property to the National Science Foundation. Turowski performed many of the functions to be expected of a real estate salesman who specializes in federal government leases: he discussed his client's proposal with government officials; he served as the defendant's designated agent during the lease competition; he submitted expressions of interest on behalf of the defendants; and he even signed and initialed significant

1

portions of the defendant's lease proposal. But Turowski never obtained a license, so all of those real estate services were performed in violation of Virginia law. Notwithstanding the illegal performance by its senior vice president, JLLA sued for a commission of more than $6.6 million after the defendants were awarded the National Science Foundation lease.

On summary judgment, the district court dismissed JLLA's suit. It held that Turowski qualified as a "real estate salesperson," Va. Code Ann. § 54.1-2101, because he was centrally involved in the chase for the National Science Foundation lease. Turowski would be barred from recovering a commission in his own right because he was never individually licensed in Virginia. Nor could Turowski be vicariously licensed through his employer. And because Virginia assigns his employer responsibility for ensuring that its employees are properly licensed, the district court applied the same rule long applied by the Virginia Supreme Court: no license, no commission.

## ISSUE PRESENTED

Did the district court correctly reject JLLA's claim for a commission on the basis of well-established Virginia law because JLLA's senior vice president illegally performed extensive real estate services without the "real estate salesperson" license required by Virginia law?

## STATEMENT OF THE CASE

Defendants Hoffman Family, LLC and Hoffman Buildings, L.P. own and manage a portfolio of office buildings in Alexandria, Virginia.[1] In August 2007, Hoffman signed an agreement for JLLA to serve as the exclusive leasing agent for those office properties. The properties included an office site at 2401 Eisenhower Avenue, which was later leased by Hoffman to the National Science Foundation. JLLA actively competed on Hoffman's behalf for that lease, in particular through the efforts of its Senior Vice President Arthur Turowski, who was not licensed as a real estate salesperson in Virginia. This case concerns whether Turowski's central but illegal role in that transaction prohibits JLLA from recovering a commission under Virginia law.

### 1.   JLLA hires Arthur Turowski for its government leasing team

In October 2007, JLLA hired Arthur Turowski, a recent retiree from the General Services Administration, for his expertise in leasing properties to the

_____

[1] This brief refers to the defendants collectively as "Hoffman." *See* JA 178 n.2.

3

federal government.  The GSA is responsible for arranging leases for much of the federal government's office space, including the National Science Foundation lease at issue in this case.  Turowski would become intimately involved with the competition for that lease.

The terms of Turowski's employment reflect his participation in JLLA's real estate business.  Turowski was a salaried employee, but he received bonuses based on commissions received by JLLA.  JA 452, 478.  His employment contract with JLLA also required him to obtain a real estate salesperson's license.  JA 486.  Turowski, however, never became licensed in any jurisdiction, and no one at JLLA ever approached him about his failure to be licensed.  JA 487, 1219.  Despite the fact that he became Senior Vice President at JLLA and the self-described "relationship manager" for Hoffman, JLLA never informed Hoffman about Turowski's failure to be licensed.  JA 487, 520.

JLLA—the entity that hired Turowski—was licensed as a real estate firm under Virginia law.  JA 2525.  After a 2008 corporate reorganization, however, JLLA's licensed salespersons transferred their licenses to a new subsidiary named Jones Lang LaSalle Brokerage, Inc., or JLLB.  JA 999.  Joseph Brennan, who also worked on the Hoffman account with Turowski but did hold a valid real estate salesperson's license, was licensed as an employee of JLLB.  JA 2516.  Turowski would later propose that Hoffman sign a new leasing agreement with

4

JLLB instead of JLLA. JA 1350. That proposed agreement listed Turowski, among others, as designated "to exclusively represent the Owner's best interests in connection with the leasing of office space." JA 1360. Hoffman declined to sign the new agreement. JA 233.

### 2. Turowski lays the groundwork for the National Science Foundation lease

In 2011, JLLA identified a large federal appropriation that was allocated for the National Science Foundation headquarters, which was then located in Arlington County. JA 324. Around that time, Turowski invited Mignon Anthony, the recently appointed Director of NSF Headquarters Procurement, to speak at JLLA's Federal Perspective conference for real estate practitioners. JA 324, 1188. Turowski discussed the NSF lease initiative with Anthony, and continued to do so until the completion of the NSF lease competition. JA 1188.

Turowski also communicated directly with GSA regarding the NSF lease. Turowski was alerted early on that GSA might not open that lease to competition when NSF's then-current landlord attempted to sell the building with the understanding that GSA had already agreed to keep NSF in place. In response, Turowski had conversations with GSA personnel about the lease competition. The GSA acting regional commissioner told Turowski that the absence of moving costs would give the incumbent landlord a significant advantage, but the Deputy

Administrator later told him that there would be a full and open competition.  JA 1190–92.

Furthermore, Turowski participated in conversations with City of Alexandria officials regarding favorable tax treatment for the NSF office.  Along with Joseph Brennan, Turowski also discussed zoning for the new office with Alexandria zoning officials.  JA 359–62.  Turowski would continue to engage in negotiations with Alexandria officials regarding the City's support for Hoffman's lease proposal.  JA 358, 1193.

### 3.   Turowski responds to GSA's first solicitation for expressions of interest in the National Science Foundation lease

On April 7, 2011, GSA issued its first solicitation for expressions of interest in providing office space for the National Science Foundation.  JA 1367-74.  This solicitation for "EOIs" was GSA's first step in identifying the pool of potential lessors should the NSF decide to relocate.  On April 12, Turowski notified Hoffman that its designated team "for the NSF chase" was "yours truly, Bob VeShancey and Brian Saal."  JA 1377–78.  Turowski and Saal—neither of whom were licensed—were responsible for Hoffman's EOI; Brennan did not participate, and VeShancey ended up representing another client altogether.  JA 328, 389, 536-37.  Turowski signed the EOI himself and invited GSA's broker to

contact him with any questions.  JA 1386.  The EOI was submitted to GSA's

broker on April 27.  JA 1381.

### 4.    Turowski counsels Hoffman how to respond to GSA's second solicitation for expressions of interest

On July 2, 2012, GSA issued a second solicitation for EOIs.  JA 1445.

This time, GSA stated that it would use the submissions to determine whether to

engage in an open competition for the NSF lease at all, as opposed to simply

extending the lease at its current location.  Because the NSF opportunity might

otherwise be foreclosed, Turowski advised Hoffman that the second EOI must

include an aggressively low rental rate "that makes it tough for them to do a sole

source" lease.  JA 557, 563–64, 1459–60.  He also advised Hoffman to save costs

by reducing brokerage commissions, and in particular by cutting the commission

for GSA's broker.  JA 551–52.  The second EOI did reflect lower commissions,

although it was JLLA's commission that was reduced.[2]  Turowski again signed

the EOI and designated himself as Hoffman's authorized contact, but this time the

EOI quoted a rental rate as Turowski advised.  JA 1504.  The second EOI was

submitted to GSA's broker on July 24.  JA 1497.

---

[2] The second EOI stated that the leasing commission for JLLA would be a flat $1 million, rather than the two percent rate that JLLA now claims.  *See* Brief of Appellant 2.  Before the district court, the parties disputed whether the $1 million commission reflected a prior oral modification to the agreement between Hoffman and JLLA.  Because the district court held that JLLA was not entitled to *any* commission for the NSF transaction, it did not resolve what the proper commission would have been had JLLA performed its duties legally.  JA 178 n.3.

**5.    Turowski prepares and signs Hoffman's response to GSA's Request for Lease Proposal**

On December 4, 2012, GSA issued a Request for Lease Proposal. GSA's broker forwarded the Request to Turowski. JA 1568. Together, JLLA and Hoffman assembled a proposal, which was submitted to GSA's broker on January 9, 2013. As with the EOIs, Turowski was listed as the designated contact for GSA questions. That designation, which was signed by Hoffman, acknowledged that JLLA "is providing brokerage services" and "continues to have authority to submit this proposal." JA 1728.

Turowski also signed a number of forms included with the lease proposal, including a certification that the building would meet each of the NSF's special requirements, JA 1618; certifications that Hoffman would correct certain fire safety or security deficiencies, JA 1681, 1690; and various other representations and certifications required by GSA, JA 1881. Turowski signed each of those as "Agent for Owner." In addition to those signatures, he initialed every page of the proposed lease form on behalf of Hoffman. JA 1759–801. In all, he initialed well over 100 pages of the proposal package. *See* JA 1683–91, 1825–70, 1872–80. Hubert N. Hoffman III signed the GSA Form 1364-C, "Proposal to Lease Space," on behalf of Hoffman Family, LLC. JA 1577.

8

**6.    Turowski prepares and signs Hoffman's response to GSA's Request for Lease Proposal for the Fish & Wildlife Service**

While the National Science Foundation competition was ongoing, Turowski represented Hoffman in another competition involving the U.S. Fish & Wildlife Service.  On August 29, 2012, he submitted a similar bid to lease a nearby property at 2461 Eisenhower Avenue.  Turowski's cover letter noted that "we are pleased to present this offer" in response to the Fish & Wildlife Service's Request for Lease Proposal, and invited GSA's broker to contact him "to further discuss the benefits of this offer."  JA 1538.

Although Hoffman was not awarded the Fish & Wildlife lease, the process revealed something important about JLLA's relationship with its client.  The Form 1364-C submitted by Turowski to GSA stated that JLLA was entitled to a one percent commission.  JA 1543.  While Turowski has denied that there was an oral agreement on that amount, it is undisputed that Turowski was aware that the Form reflected a one percent commission but chose not to notify Hoffman that JLLA would eventually pursue a two percent commission.  In emails with Joseph Brennan on the day that Turowski submitted the Fish & Wildlife proposal, Turowski noted the commission discrepancy between the Form 1364-C and the unmodified leasing agreement.  His response:  "Contract rules, I'd say."  JA 1566.

9

JLLA's corporate representative would later condone this behavior as consistent with corporate policy.  JA 1068–70.

### 7.    GSA awards the National Science Foundation lease to Hoffman

After Hoffman's initial lease proposal was submitted on January 9, 2013, GSA requested corrections and additional information several times.  GSA copied no one at JLLA on those requests except Turowski, who helped Hoffman address GSA's concerns.  JA 367, 1929–32, 1934–42.  Turowski also participated in a meeting with Joseph Brennan and representatives from Hoffman, GSA, and GSA's broker regarding Hoffman's lease proposal.  JA 1198.

During that time, Turowski spoke directly with GSA's broker regarding that broker's commission.  JA 1974–77.  The district court noted that this was "something that needed to be settled before the leasing transaction could be finalized."  JA 190; JA 603.  Hoffman ultimately accepted Turowski's recommendation to agree to a slightly higher commission for GSA's broker.  JA 1974–76.  Hoffman's final lease proposal was submitted on March 7, 2013.  JA 1980.

That proposal proved successful.  On May 15, 2013, GSA notified Hoffman that its lease proposal had been chosen.  JA 2132–33.  Prior to that time, GSA's broker had asked to communicate directly with Hoffman because JLLA

was simultaneously representing competing lessors.  JA 843, 847; *see also* JA 179 n.4.  After a series of discussions between Hoffman and GSA, Hoffman signed and delivered the NSF lease on May 23.  JA 2286.  GSA delivered the fully executed lease to Hoffman on June 7 and publicly announced the result of the competition that same day.  JA 2287–493.

### 8.    JLLA files suit

On June 17, 2013, Joseph Brennan called a Hoffman representative to discuss the NSF lease.  During that conversation, Brennan asked for a copy of the final lease for the stated purpose of calculating JLLA's two percent lease commission, rather than the $1 million commission reflected in Hoffman's second EOI and other documents.  JA 299–301.  Hoffman tendered payment for the first installment of the $1 million commission, but JLLA rejected the tender and filed suit on August 16, 2013 for approximately $6.6 million.  JA 2.

### 9.    The district court holds that the extensive participation by an unlicensed real estate salesperson bars JLLA's claim

The district court dismissed JLLA's claim on summary judgment.  First, the court noted that Virginia law requires every brokerage employee who acts as a real estate salesperson to be licensed as a real estate salesperson.  JA 186 (citing Va. Code Ann. § 54.1-2106.1(A)–(C)); *see also* § 54.1-2101 (a real estate salesperson is employed by a real estate broker "to lease, rent or offer for rent any real estate, or to negotiate leases thereof").  Then, the court found that despite

11

Turowski's lack of license, he was "centrally involved in many of the leasing activities" that JLLA performed for Hoffman. JA 189–190. In particular, Turowski "work[ed] with Alexandria City officials as well as GSA personnel and GSA's broker, all on behalf of Hoffman, for the purpose of marketing Hoffman's property and soliciting and procuring the NSF lease." JA 190. He signed Hoffman's EOIs and identified himself as the owner's agent and contact. He initialed every page of the proposed lease form. He continued to pass on communications between Hoffman and GSA after the initial proposal. He even helped negotiate the commission for GSA's broker, "something that needed to be settled before the leasing transaction could be finalized." JA 190.

JLLA argued that notwithstanding those facts, Hoffman stipulated away its case by agreeing that (1) only Hoffman signed the initial GSA Form 1364-C; (2) only Hoffman was the "offeror" for the NSF lease; (3) only Hoffman "submitted" the final revised proposal to GSA; and (4) only Hoffman conducted lease negotiations with GSA and its broker. JA 190–91. The district court rejected JLLA's argument that those were the only activities that could make Turowski a real estate salesperson. The court explained that "the use of the words 'lease,' 'offer' and 'negotiate' in the definition of a real estate salesperson are clearly intended to capture the realities and breadth of activities that make up the leasing process, not the specific, more formal events necessary to consummate a

12

transaction." JA 191. Moreover, "JLLA's narrow, hyper-formalistic reading of the licensing requirements would effectively eliminate the need for a license by most persons centrally involved in a leasing transaction on behalf of an owner, as Turowski was for Hoffman here." *Id.* The district court relied on precedent from the Virginia Supreme Court holding that terms such as "negotiate" in the definition of a real estate salesperson "are to be construed broadly, not narrowly or technically." JA 191 (citing *Massie v. Dudley*, 3 S.E.2d 176 (Va. 1939)).

The district court then "easily" concluded that Turowski's failure to be licensed as required by Virginia law prohibited JLLA from recovering any commission. JA 193. First, the court noted that Virginia has a well-established public policy forbidding an unlicensed real estate agent to recover commissions. *Id.*[3] Next, the court observed that under Virginia law, JLLA's firm license did not "cover Turowski or cure Turowski's failure to obtain a license." JA 193–94. The district court then catalogued the Virginia statutes requiring JLLA to ensure that its employees were properly licensed. JA 194. As a result of those "settled

---

[3] JLLA infers from the district court's restatement of well-established Virginia law that the court somehow thought Turowski himself would receive the commission. *See* Brief of Appellant 54 n.10. But the district court made abundantly clear that it was JLLA that claimed the right to the commission. *See, e.g.*, JA 179 ("the parties' dispute arose over *JLLA's* commission") (emphasis added).

propositions," the court granted Hoffman's motion for summary judgment and dismissed the case.  JA 193–94.

## SUMMARY OF THE ARGUMENT

I.    The district court correctly found that Arthur Turowski acted as a "real estate salesperson."  As relevant here, Virginia defines a salesperson as anyone who is employed by a real estate broker "to rent or offer to rent any real estate, or to negotiate leases thereof."  Va. Code Ann. § 54.1-2101.  The Virginia Supreme Court has interpreted "negotiate" broadly to mean not just bargaining over lease terms, but rather the whole process of bringing parties together in the right frame of mind to conclude an agreement.  Likewise, "offer for rent" means, in context, advertising that property is available for lease.

Turowski both "offered for rent" and "negotiated" in the relevant senses. Among other things, he brought Hoffman and GSA together by communicating with government officials about having an open lease competition.  He advised Hoffman to sweeten its EOI to force GSA to keep the competition open.  He signed and submitted expressions of interest that advertised to GSA that Hoffman was a serious player in the competition.  He served as Hoffman's designated contact for GSA throughout most of the process.  He even signed and initialed much of Hoffman's initial lease proposal.  None of the purported judicial admissions raised by JLLA call into question those activities, which are more than sufficient to qualify Turowski as a real estate salesperson.

II.     The district court correctly concluded that as a result of Turowski's unlicensed real estate activities, the contract between JLLA and Hoffman cannot be enforced.  The Virginia Supreme Court has long held that a contract to perform unlicensed real estate services is illegal and unenforceable.  That holding cannot be distinguished on the grounds that JLLA has a license, because employees must be individually licensed under Virginia law.  Nor does it matter that the contract was initially valid; the law has long treated contracts as unenforceable if either the formation or the performance thereunder is illegal.  Other states accordingly refuse to enforce claims for real estate commissions when an unlicensed employee performs services on behalf of a licensed broker.

JLLA provides no reason to depart from Virginia's "no license, no commission" rule.  Nothing in that rule conflicts with the authority of the Virginia Real Estate Board to penalize unlicensed practice.  Nor is there any reason to put a thumb on the scales in favor of enforcing contracts that violate Virginia's licensing laws.  Finally, free-floating principles of equity have no application here.

# ARGUMENT

## I.    The district court correctly held that Virginia law requires Turowski to be licensed as a real estate salesperson

The district court concluded that Turowski's extensive participation in the NSF lease transaction rendered him a "real estate salesperson" in Virginia. That conclusion is both compelled by Virginia Supreme Court precedent and necessary to prevent the evisceration of Virginia's licensing laws.

### A.    Anyone who is employed by a real estate broker "to rent or offer to rent any real estate, or to negotiate leases thereof" in Virginia is a "real estate salesperson" and must be licensed

Real estate transactions can be a dangerous business. When it comes to complex, high-stakes deals, few parties are sufficiently savvy to represent themselves, and many must depend on the experience and knowledge of a real estate advisor. Unfortunately, the "relations of trust and confidence" inherent in that relationship leave clients vulnerable to "the fraud, misrepresentation, and imposition of dishonest and incompetent persons." *Massie v. Dudley*, 3 S.E.2d 176, 181 (Va. 1939). To no one's surprise, the annals of the courts are littered with the wreckage of unworthy advisors. *See* 1 Nathan W. MacChesney, Principles of Real Estate Law 766 (1927); *see also Roman v. Lobe*, 152 N.E. 461, 462 (N.Y. 1926) (Cardozo, J.).

17

To ensure that its citizens are represented in real estate transactions by men and women of "honesty and a fair amount of intelligence," *Massie*, 3 S.E.2d at 181, the Commonwealth of Virginia has crafted a comprehensive real estate licensing scheme. One of the cornerstones of that scheme is the requirement that "[n]o individual shall act as a [real estate] salesperson without a salesperson's license" issued by the Virginia Real Estate Board. Va. Code Ann. § 54.1-2106.1(C).[4] Virginia classifies as a real estate salesperson

> any person . . . who for compensation or valuable consideration is employed either directly or indirectly by . . . a real estate broker, to sell or offer to sell, or to buy or offer to buy, or to negotiate the purchase, sale or exchange of real estate, or to lease, rent or offer for rent any real estate, or to negotiate leases thereof, or of the improvements thereon.

Va. Code Ann. § 54.1-2101.[5] No pattern or practice of acting as a real estate salesperson is necessary to trigger the license requirement; "[o]ne act . . . of leasing, or renting, or offering to rent real estate" is enough to constitute a real estate salesperson. § 54.1-2107.

---

[4] To qualify for a license, individuals must meet the Board's standards for education and real estate training. § 54.1-2105. They must also complete a real estate curriculum in the year following licensure, § 54.1-2105.01, as well as continuing education on real estate ethics and other topics throughout their careers, § 54.1-2105.03.

[5] A similar definition applies to "real estate brokers," except that brokers need not be employees or independent contractors. *See* Va. Code Ann. § 54.1-2100.

Individual salespersons are not the only ones who must be licensed. Corporations that act as real estate firms must be licensed as well. § 54.1-2106.1(A). That firm license cannot be issued unless every employee who acts as a salesperson is also licensed. § 54.1-2106.1(A)(ii). Those employees must also be monitored by a "supervising broker" who "shall exercise reasonable and adequate supervision" over the firm's real estate practice. § 54.1-2110.1(A). Among other things, supervising brokers are responsible for "[e]xercising appropriate oversight and limitations on the use of unlicensed assistants," as well as generally ensuring that the firm's real estate services are carried out in accordance with Virginia's licensing regime. § 54.1-2110.1(B)(2)(e), -(B)(3).

### B. The district court rightly held that Virginia's definition of real estate salesperson captures the broad range of activities throughout the leasing process

The primary dispute in this case concerns the scope of Virginia's definition of "real estate salesperson." As relevant here, a salesperson is any person who is employed by a real estate broker "to lease, rent or offer for rent any real estate, or to negotiate leases thereof." Va. Code Ann. § 54.1-2101. The district court, mindful of the prophylactic nature of Virginia's real estate licensing laws, concluded that "the use of the words 'lease,' 'offer,' and 'negotiate' . . . are clearly intended to capture the realities and breadth of the activities that make up

the leasing process." JA 191. That is exactly right: Virginia law does not have a gaping loophole for salespersons who participate in the entire leasing process up until the formal events necessary to finally consummate a lease. *Id.*

### 1. "Negotiating leases" begins when the salesperson introduces the parties to the transaction

Virginia's licensing laws require a license to "negotiate" a lease. The Virginia Supreme Court has already defined that term quite broadly: "to conduct communications or conferences as a basis for agreement." *Massie v. Dudley*, 3 S.E.2d 176, 179 (1939) (quoting Webster's New Int'l Dictionary (2d ed.)). In *Massie*, the Supreme Court had no difficulty concluding that the broker had "negotiated" a sale when he found a buyer for the property, made a pitch, kept the parties in contact, and "smoothed out the differences" between them. *Id.* The Court noted that those actions together "*completely* constitute[d] the elements of negotiation," *id.* at 180 (emphasis added), and explained: "'A broker negotiates just as much when he brings parties together in such frame of mind that they can by themselves evolve a plan of procedure, as when he himself carries on the discussion and personally induces an agreement to accept a specific provision,'"

20

*id.* (quoting *Grammer v. Skagit Valley Lumber Co.*, 299 P. 376, 378 (Wash. 1931)).[6]

The Fourth Circuit has reached a similar conclusion. *Smithy Braedon Co. v. Hadid* concerned the propriety of a contract that paid a commission to an unlicensed co-broker who performed no brokerage services. 825 F.2d 787 (4th Cir. 1987). In holding that the contract was enforceable under Virginia, Maryland, and D.C. law, this Court distinguished *Thorpe v. Carte*, 250 A.2d 618 (Md. 1969), where the unlicensed co-broker performed one key function: he introduced the seller to a licensed broker. The Court stated that that co-broker "*did* perform services leading to the sale of real estate, thus raising the threat to the public that the statute seeks to prevent." *Smithy Braedon*, 825 F.2d at 791 (emphasis added). If introducing a seller to another broker implicates the consumer protections of real estate licensing laws, surely introducing a seller to a *buyer* requires a license as well.

Virginia is no outlier in construing the term "negotiate" broadly in its real estate licensing statute. To the contrary, other states with similar licensing requirements have recognized the pressing need to give that term its full meaning.

---

[6] *See also* 1973–74 Op. Atty. Gen. Va. 287–288 ("The fact that [liaisons between prospective buyers and sellers' agents] do not engage in bargaining with or for the buyer and/or the seller does not mean that they are not engaged in the negotiation of the sale."); 1989 Op. Atty. Gen. Va. 287–288 (reward program for referring other customers to a homebuilder results in "negotiation").

In *RDP Development Corp. v. Schwartz*, for example, the D.C. Court of Appeals addressed an unlicensed firm's argument that it was a mere "consultant" whose "role was not to negotiate with [the lessee], but merely to bring the parties to a point where they [would] subsequently be inclined to negotiate." 657 A.2d 301, 305 (1995). The court squarely rejected that restrictive reading, and "particularly the distinction it would have us draw between negotiation and conduct preliminary to negotiation, as artificial and incompatible with the broad protective purposes of the licensing law." *Id.* at 306–07.[7]

JLLA, however, assumes that "negotiate" has a "narrow, hyper-formalistic" meaning that boils down to haggling over lease terms. JA 137; *see*

---

[7] *See also Rabin v. Prenzler*, 451 N.E.2d 1331, 1337 (Ill. Ct. App. 1983) (unlicensed broker's strict construction of "negotiates" "would lead to an untenable result"; "arrang[ing] the preliminaries of a business transaction" by introducing the prospective tenant to the lessor sufficed for negotiation); *Alford v. Raschiatore*, 63 A.2d 366, 368 (Pa. Super. Ct. 1949) (rejecting a strict construction of "negotiates" because "it would exclude from the regulatory purpose of the [licensing act] a great percentage of brokers and salesmen who normally do no more than acquaint prospective buyers and sellers with the location and price of available property"); *Grammer v. Skagit Valley Lumber Co.*, 299 P. 376, 380 (Wash. 1931) ("Every unlicensed broker will make the same argument that the plaintiff here has made, that he did not have to bring the parties to actual agreement upon all the details, that that phase was something for the parties themselves to determine."); *Certified Realty Co. v. Reddick*, 456 P.2d 502, 505 n.2 (Ore. 1969) ("[T]he obtaining of a listing agreement constitutes the beginning point of a 'negotiation' for the sale of property and falls within the statutory definition."). *But see Shaffer v. Beinhorn*, 213 P. 960, 962 (Cal. 1923) (no "negotiation" where the unlicensed broker's "only duty was to produce a prospective purchaser").

22

*also* Brief of Appellant 36–37. As just explained, that stingy construction is contrary to binding precedent from the Supreme Court of Virginia as well as the great weight of authority in other states. Those courts have squarely rejected the argument that there is some sort of safe harbor for a salesperson whose participation ends before the final bargaining over lease terms begins. And with good reason: if no license were required before the leasing process entered the home stretch, clients would be at the mercy of unscrupulous salespersons at times when honest, competent advice is every bit as important. *See Grammer*, 299 P. at 380 ("[E]very unlicensed broker w[ould] be enabled to carry on his business just as he did before the statute came into existence, simply by calling himself a finder, an originator, an introducer, instead of a broker.").

As the district court noted, another problem with JLLA's narrow interpretation of "negotiate" is that it would render superfluous several of Virginia's statutory exemptions to the licensing requirement. For example, § 54.1-2103(A)(7) exempts a tenant of a residential building who refers a prospective tenant to the owner in exchange for a referral fee. There would be no need for this exemption under JLLA's restrictive construction because tenants do not, as a rule, bargain over their neighbors' lease terms. But the exemption is entirely necessary if—as the Virginia Supreme Court has already said— "negotiation" includes "bring[ing] parties together in such frame of mind that

23

they can by themselves" reach an agreement. *Massie*, 3 S.E.2d at 180. Other

exemptions are likewise inexplicable if "negotiation" means what JLLA says.[8]

The broad interpretation of "negotiate" adopted in *Massie* remains necessary to

give effect to the entirety of Virginia's licensing act, "so that no part will be

inoperative or superfluous, void or insignificant." *Shipbuilders Council of Am. v.

United States Coast Guard*, 578 F.3d 234, 244 (4th Cir. 2009); *accord

Commonwealth v. Squire*, 685 S.E.2d 631, 634 (Va. 2009).

## 2. "Offering for rent" means advertising that property is available for rent

Virginia also requires a license when a salesperson "offer[s] for rent any

real estate." Va. Code Ann. § 54.1-2101. JLLA has adopted a "narrow, hyper-

---

[8] For example, none of the exempted activities in § 54.1-2103(C) would
otherwise require a license under JLLA's interpretation:

> The provisions of this chapter shall not apply to any salaried person
> employed by a licensed real estate broker for and on behalf of the
> owner of any real estate or the improvements thereon which the
> licensed broker has contracted to manage for the owner if the actions
> of such salaried employee are limited to

> (i)     exhibiting residential units on such real estate to prospective
>         tenants, if the employee is employed on the premises of such
>         real estate;

> (ii)    providing prospective tenants with factual information about
>         the lease of residential real estate;

> (iii)   accepting applications for lease of such real estate; and

> (iv)    accepting security deposits and rentals for such real estate.

formalistic reading" of that phrase as well. In particular, JLLA's view is that § 54.1-2101 refers only to a "legally operative" promise that forms a contract when it is accepted. *See, e.g.*, Brief of Appellant 18; *cf.* Restatement (Second) of Contracts § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."). The implication of JLLA's reading is that an unlicensed individual would be permitted to act precisely the way a real estate salesperson would—*e.g.*, persuading an owner to list real estate for rent, charging a fee for advice on price and lease terms, hanging a "For Rent" sign on the property, and advertising the rental in newspapers and online—so long as he does not *personally* make the final offer to the lessee.

That reading of "offer for rent" is implausible. Courts do not reflexively cram common law definitions into statutes "where they plainly do not fit." *Johnson v. United States*, 559 U.S. 133, 139–40 (2010). Here, that common law meaning is inappropriate because it would render the phrase "offer for rent" practically nugatory; rarely will someone other than the owner actually "make an offer" in that sense. In fact, JLLA maintains that real estate salespersons are prohibited from signing GSA Form 1364-C, so it would follow that a salesperson could *never* "offer for rent" in the federal lease procurement context. *See* Brief of Appellant 25 n.8; *see also* JA 132, 1235–36. As a result, JLLA's reading "would

25

effectively eliminate the need for a license by most persons centrally involved in a leasing transaction on behalf of an owner." JA 191. The legislature could not have intended a reading of "offer for rent" that would render this consumer-protection statute so toothless.

There is another meaning of "offer for rent" that does not "produce nonsense" and is a far better fit for the statutory context. *Johnson*, 559 U.S. at 139–40. It is common usage in the real estate field to announce that property is "offered for rent" or "offered for sale" in the sense that property is marketed as available—but *not* in the sense that the owner has already made a legally operative promise to lease or sell. *See, e.g.*, *Historic Hydro Plant For Sale*, Richmond Times-Dispatch, Mar. 6, 2013 (hydroelectric plant "will go on the market" and "is being offered for sale at $3.5 million"). It is also consistent with the way the Attorney General of Virginia has interpreted the phrase. *See* 1973–74 Op. Atty. Gen. Va. 287–288 (liaising between prospective buyers and sellers' agents "constitute[s] an offer of sale").

Furthermore, this non-technical reading of "offer for rent" accords with the broad consumer-protective purpose of Virginia's licensing act. *See Massie*, 3 S.E.2d at 181. In particular, this reading affords protection to clients not just at the tail end of the leasing process, but as soon as critical decisions regarding marketing must be made. Virginia law in fact enshrines effective marketing as

one of the primary duties of a real estate salesperson, § 54.1-2133(A)(2), so it is only natural that Virginia would require a license for that critical salesperson function.

### C. The district court correctly found, based on undisputed facts, that Turowski acted as a real estate salesperson without a license

The district court found that Turowski, who was "centrally involved in many of the leasing activities" that JLLA performed on Hoffman's behalf, acted as a "real estate salesperson" within the meaning of Va. Code Ann. § 54.1-2101. JA 189. That finding is abundantly supported by the undisputed facts.

### 1. Turowski both offered to rent real estate and negotiated a lease within the meaning of Virginia's licensure laws

Turowski's actions easily meet Virginia's broad definition of a "real estate salesperson." As discussed above, *supra* at 19–23, an individual "negotiates" when "he brings parties together in such frame of mind that they can by themselves evolve a plan of procedure" for concluding an agreement. *Massie*, 3 S.E.2d at 180. And a salesperson "offers real estate for rent" by advertising its availability for lease. *Supra* at 23–25.

Turowski has never been licensed as a real estate salesperson. JA 486–87. Nevertheless, he began the process of bringing Hoffman and GSA together to conclude the NSF lease early on. As the district court found, Turowski

"participated in identifying the NSF leasing opportunity, bringing it to Hoffman's attention, and developing the successful strategy that resulted in GSA's decision to competitively bid the NSF lease renewal and Hoffman's successful bid."  JA 189–90.   In particular, Turowski initiated contact with Mignon Anthony, the Director of NSF Headquarters Procurement, and continued to discuss the NSF lease competition with her throughout the process.  JA 324, 1188.  He also spoke directly to GSA personnel about the lease competition.  JA 1190–92.

The  first  formal  step  in  both  advertising  the  availability  of  2401 Eisenhower  Avenue  and  bringing  the  parties  together  was  the  submission  of Hoffman's expression of interest.   Turowski was undeniably involved in that project  as  the  "relationship  manager"  for  Hoffman:  he  signed  the  EOI  on Hoffman's behalf and explicitly identified himself as Hoffman's designated agent to answer GSA's questions.  The second EOI was perhaps even more important because, as Turowski advised Hoffman, there was a risk that Hoffman would be shut out of any competition if its EOI was insufficiently compelling.  JA 520, 557, 563–64, 1459–60.  Turowski again signed the EOI and named himself Hoffman's designated contact.  JA 1504.  The second EOI reflected Turowski's advice that Hoffman should quote a rental rate low enough to force GSA into an open competition for the NSF lease.  JA 557.

28

The second EOI was successful in bringing Hoffman and GSA to the next step of negotiations: GSA issued a Request for Lease Proposal which GSA's broker forwarded to Turowski. JA 1568. The initial lease proposal submitted in response had Turowski's fingerprints all over it. He initialed over 100 pages, including every page of the proposed lease itself. JA 1759–801. He also signed, as "Agent for Owner," a host of representations and certifications required by GSA. JA 1618, 1681, 1690, 1881. Turowski was again listed as Hoffman's designated contact by a letter that acknowledged JLLA "is providing brokerage services" and "continues to have authority to submit this proposal." JA 1728.

After Hoffman's initial lease proposal, Turowski continued to be involved when GSA requested corrections and additional information from Hoffman. JA 1198, 1929–32, 1934–42. Turowski also discussed and concluded an arrangement with GSA's broker regarding its commission, which allowed the leasing transaction to be finalized. JA 603, 1974–1977.

Together, those activities are more than sufficient to constitute "negotiation" and "offering for rent" within the meaning of Va. Code Ann. § 54.1-2101. In fact, Turowski did significantly more in this case than in other cases where courts have found that a salesperson's activities required a license. *See, e.g.*, *RDP Dev. Corp. v. Schwartz*, 657 A.2d 301, 305 (D.C. 1995) (unlicensed plaintiff met with potential lessors); *Rabin v. Prenzler*, 451 N.E.2d

29

1331, 1337 (Ill. Ct. App. 1983) (unlicensed plaintiffs introduced tenants to defendants). There is no reason to disturb the district court's well-supported finding that Turowski was a "real estate salesperson."

### 2. The district court properly rejected the argument that Turowski was not a real estate salesperson by judicial admission

In truth, JLLA does not even attempt to dispute that Turowski acted as a "real estate salesperson" as the district court (correctly) understood that term. Instead, JLLA makes the surprising argument that Hoffman actually admitted Turowski did not engage in *any* real estate salesperson activities. *See* Brief of Appellant 38–46. The district court easily rejected that argument. This Court should too.

Judicial admissions primarily "go to matters of fact which, otherwise, would require evidentiary proof." *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963). As such, they "serve a highly useful purpose in dispensing with proof of formal matters and of facts about which there is no real dispute." *Id.* Judicial admissions can also include matters of law when there are "intentional and unambiguous waivers that release the opposing party from its burden to prove the facts necessary to establish the waived conclusion of law." *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014); *see also Fraternal Order of Police Lodge No. 89 v. Prince George's Cnty*, 608 F.3d 183,

190 (4th Cir. 2010) (a lawyer's statements may constitute a binding admission only if "the statements are deliberate, clear, and unambiguous").  Whether a particular statement constitutes a judicial admission depends on context, *see Fraternal Order of Police Lodge No. 89*, 608 F.3d at 190 (representations "do not, when assessed in context, demonstrate [a] deliberate, clear, and unambiguous abandonment"); *see also Minter*, 762 F.3d at 348, and this Court accordingly reviews a district court's determination only for abuse of discretion.  *Minter*, 762 F.3d at 347.

JLLA alleges that Hoffman conceded below that Turowski did not "offer for rent" or "negotiate," period.  *See* Brief of Appellant 41.  Hoffman conceded no such thing.  As to the alleged concession that JLLA did not "make an offer for rent" within the meaning of Va. Code Ann. § 54.1-2101, Hoffman merely stipulated to certain undisputed facts, including: (1) JLLA did not sign the GSA Form 1364-C in the lease proposals, JA 58, 768, 1098, 1108; (2) the proposals were on behalf of the lessor Hoffman, not the agent JLLA, JA 1150, 1177; and (3) Hoffman, rather than JLLA, transmitted those proposals to GSA, JA 1211–1212.  For the reasons already given, those are not the only ways for a real estate salesperson to "offer for rent" within the meaning of § 54.1-2101, and Hoffman's narrow factual stipulations cannot be read as a broad waiver of its legal claim that Turowski offered Hoffman's office property for rent.

31

Likewise, Hoffman did not admit that JLLA performed no "negotiations" within the meaning of Virginia's licensing law. Rather, Hoffman agreed to the obvious fact that JLLA did not itself bargain over lease terms.[9] That is because GSA's broker had already requested to deal with Hoffman directly. In fact, JLLA's own brief makes clear that it understood Hoffman correctly: "JLL did not participate in any 'discussions,' with the GSA *after* the Hoffman Companies submitted their Final Proposal Revision to the Government." Brief of Appellant 25 (summarizing JA 1209; emphasis added). The context in which these and other similar stipulations arose makes clear that they refer to "negotiations" at a particular point in time. They are far from a "deliberate, clear, and unambiguous abandonment" of the argument that Turowski engaged in "negotiations" within the meaning of Va. Code Ann. § 54.1-2101. *Fraternal Order of Police Lodge No. 89*, 608 F.3d at 190.

The district court, whose determinations on the existence and scope of a judicial admission are entitled to deference, *Minter*, 762 F.3d at 347, was not deceived by JLLA's game of "gotcha" with Hoffman's "purported admissions."

---

[9] *See, e.g.*, JA 847 ("Q: . . [W]hen the negotiations regarding the terms of the lease to be signed were taking place, JLL didn't take part in any of those negotiations, did it? A: Not at the end."); JA 687 ("the final negotiations for the lease . . . were conducted by [Hoffman representatives]"); JA 954 ("Q: During the finalization, during the final negotiations . . . when the final lease terms were hammered out, JLL played no role whatsoever in the hammering out of those final lease terms. Is that fair to say? . . . A: Yes.").

JA 190–91.  That court correctly identified the meaning of Hoffman's admissions and held that while those agreed facts might be dispositive under JLLA's "narrow, hyper-formalistic" theory of the case, they are beside the point when the terms "offer for rent" and "negotiate" are properly understood in the context of Va. Code § 54.1-2101.  JA 191.  Turowski's activities before JLLA ceased to be involved with the NSF transaction were more than sufficient to render him a real estate salesperson within the meaning of Virginia's licensure laws.

## II.    The district court properly followed Virginia law that refuses to enforce brokerage agreements involving unlicensed real estate salespersons

For the foregoing reasons, the district court correctly found that Turowski was a real estate salesperson who acted without the license required by Va. Code Ann. § 54.1-2106.1(C).  The district court also correctly stated what follows from that finding:  JLLA cannot enforce the contract under which it provided illegal services.

### A.    Virginia's strong public policy announced in *Massie* prohibits enforcement of contracts to compensate illegal work by an unlicensed salesperson

The lesson of Virginia's seminal unlicensed-broker case is clear: Virginia takes its real estate licensing act seriously.  In *Massie v. Dudley*, the unlicensed broker could hardly be faulted for lack of diligence: He successfully procured a buyer, kept the channels of communication open, and was the "linchpin which

33

kept the progress of the negotiations from breaking off." 3 S.E.2d 176, 180 (Va. 1939); *see also id.* at 178 ("There is no denial of the time and effort which [plaintiff] claims he spent toward effecting the sale."). But to the Virginia Supreme Court, the broker's lack of license was more important than his diligence. Without a license, the brokerage agreement was illegal, and therefore unenforceable. *Id.* at 180. The court explained: "The law refuses to enforce illegal contracts, as a rule, not out of regard for the party objecting, nor for any wish to protect his interests, but from reasons of public policy." *Id.*

That rule remains firmly ensconced in Virginia. *See Harrison & Bates, Inc. v. LSR Corp.*, 385 S.E.2d 624, 626 (Va. 1989) ("It is well established that, because a contract made in violation of the real estate licensing statutes is illegal, an unlicensed agent cannot recover compensation for his services in negotiating a sale under the contract."); *Hancock Co. v. Stephens*, 14 S.E.2d 332, 334 (Va. 1941) ("Although we recognize the apparent hardships sometimes resulting, we have consistently held that the courts will not aid a party to enforce an agreement made in furtherance of acts expressly made illegal by the statutes."). Unlicensed real estate salespersons and brokers face the same consequences in other states with similar licensing statutes. *See Massie*, 3 S.E.2d at 181.

**B.    There is no exception to Virginia's public policy against illegal real estate activity for unlicensed salespersons who are employed by licensed firms**

JLLA attempts to distinguish *Massie* in two respects.  First, JLLA places great weight on the fact that *Massie* involved an unlicensed solo practitioner, whereas the unlicensed salesperson in this case was employed by a licensed real estate firm.  *See* Brief of Appellant 51–52.  Second, JLLA contends that *Massie* should apply to contracts that are illegally formed but not to contracts that are illegally performed.  Neither distinction is persuasive.

**1.    JLLA's firm license does not excuse Turowski's lack of individual license**

The fact that JLLA itself holds a real estate firm license—and has employees other than Turowski who are licensed—means only this: JLLA *could* have staffed the NSF transaction properly, and *Massie* need not have barred the commission.    Aside from that, JLLA's "firm" license in no way excuses Turowski's failure to be licensed.    Virginia law is abundantly clear that an individual who lacks his own license cannot be vicariously licensed through his employer:  Real estate firms must certify, as a condition of licensing, that "*every* employee . . . who acts as a salesperson for such [firm] holds a license as a real estate salesperson or broker."   Va. Code Ann. § 54.1-2106.1(A)(ii) (emphasis added).   And of course, "[n]o individual shall act as a salesperson without a salesperson's license from the Board."   § 54.1-2106.1(C); *see also Hancock Co.*

*v. Stephens*, 14 S.E.2d 332, 334 (Va. 1941) ("[O]ne real estate broker's license cannot license both a corporation and a person."). JLLA's attempt to shift the focus away from Turowski's lack of license is fruitless under Virginia law.[10]

Moreover, JLLA shares the blame under Virginia law for Turowski's failure to be licensed. JLLA itself is responsible for certifying that each of its salespersons is properly licensed. Va. Code Ann. § 54.1-2106.1(A)(ii). JLLA is also required to employ a "supervising broker" to "exercise reasonable and adequate supervision" over its salespersons. § 54.1-2110.1(A). That duty of supervision includes ensuring that all brokerage services are carried out "in accordance with the provisions of this chapter," § 54.1-2110.1(B)(3)—not least of which is the individual licensing requirement of § 54.1-2106.1(C). *See also* § 54.1-2106.2 (supervising broker must certify that he has audited the firm's operations for compliance). Moreover, JLLA's office was required to issue "clear guidance" on "[e]xercising appropriate oversight and limitations on the use of unlicensed assistants." § 54.1-2110.1(B)(2)(e). Notwithstanding those statutory

---

[10] JLLA tries to make hay out of the fact that Massie himself was to receive the commission, whereas the check in this case would be made out to Turowski's employer. Brief of Appellant 51–52. But the fact that Turowski receives a salary from his employer does not make him any less of a real estate salesperson. *See* Va. Code Ann. § 54.1-2101 (real estate salespersons are employed "for compensation or valuable consideration"). And to the extent that the form of his compensation is relevant, Turowski is compensated in part through a bonus that would have included some portion of any commission from the NSF transaction. *See* JA 452, 478.

36

duties—which are reflected in Turowski's own employment contract, *see* JA 486—he was employed for years without complaint from anyone at JLLA. By allowing Turowski to engage in an extensive unlicensed real estate practice that JLLA was responsible for preventing, JLLA participated in the illegality and is barred by *Massie* from recovering a commission.

### 2. *Massie* is not limited to contracts that are void *ab initio*

JLLA next contends that *Massie* is confined to agreements that are illegal from the outset—"void *ab initio*" in JLLA's words.[11]   Because the Leasing Agreement in this case was initially valid and *could* have been staffed by licensed salespersons, the argument goes, *Massie* does not apply.  This boils down to a request for courts to enforce illegally *performed* contracts even if illegally *formed* contracts are unenforceable.  That curiously gerrymandered rule is not the law in Virginia.

The traditional rule is that a bargain is illegal (and generally unenforceable on grounds of public policy) when "either the formation *or the performance thereof* is prohibited by constitution or statute."  Restatement (First) of Contracts § 580 (1932) (emphasis added).[12]   That rule makes perfect sense; surely the state

---

[11] But not *Massie*'s—that case never uses the term "void *ab initio*."

[12] *See also id.* § 580(2)(d) ("Legislative intent to prohibit the formation of a bargain, or an act essential for its performance, may be manifested by . . . requiring a license . . . from persons making such bargains or doing acts essential

has the same interest in denying relief to someone who has actually broken the law as to someone who has only promised to break the law. *See id.* § 598 cmt. a ("Courts do not wish to aid a man who founds his cause of action upon his own immoral or illegal act.").[13]

Nothing in *Massie* calls that traditional rule into question by suggesting that contracts that are performed illegally are in fact enforceable. To the contrary, *Massie* quotes with approval the rule that "there can be no recovery if a license has not been procured *prior to the rendition of the services sued for*." 3 S.E.2d at 180 (quoting 8 Am. Jur. Brokers § 154; emphasis added). That suggests— consistent with the Restatement—that illegal performance is at least as important as illegal formation.

This Court has reached that same conclusion. In *Smithy Braedon Co. v. Hadid*, a licensed broker sued its client to recover a commission. 825 F.2d 787, 791 (4th Cir. 1987). The client objected that the brokerage agreement was illegal

---

for their performance."); *accord* Restatement (Second) of Contracts §181 (1981) ("If a party is prohibited from doing an act because of his failure to comply with a licensing [requirement], a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if (a) the requirement has a regulatory purpose, and (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement.").

[13] JLLA suggests in passing that *Massie* should be distinguished because the client in that case was unsophisticated. *See* Brief of Appellant 51 n.9. But the Virginia Supreme Court has made abundantly clear that *Massie* is justified by the illegality of the plaintiff, not sympathy for the defendant. *See supra* at 32–33.

because it involved a payment to an unlicensed "cooperating broker." *Id.* at 789. This Court held that the contract was nevertheless enforceable because the unlicensed broker "performed no act restricted by statute to licensed real estate brokers." *Id.* at 791. The opinion explained that "the Virginia statute is concerned with the *actual performance of services* by unlicensed brokers." *Id.* (emphasis added). This case presents the actual performance that was missing in *Smithy Braedon*, and the contract is unenforceable as a result.

While Virginia has not squarely addressed the facts of this case, other states have. "[A]lmost every court" to consider "whether a licensed broker may prevail in an action to recover a commission when the evidence establishes that an unlicensed person illegally participated in the transaction" has refused enforcement. *Dow & Condon, Inc. v. Brookfield Dev. Corp.*, 833 A.2d 908, 918 (Conn. 2003). And in particular, those courts have held that licensed employers cannot recover commissions based on the real estate services performed by unlicensed employees.[14] JLLA has given no reason to think that Virginia would be an outlier.

---

[14] *See Farragut Baggage & Transfer Co. v. Shadron Realty Inc.*, 501 P.2d 38, 42 (Ariz. Ct. App. 1972) (broker's claim for commission was "tainted with illegality" because the broker's agent "performed acts requiring a real estate salesman's license while he was unlicensed"); *Brener & Lewis, Inc. v. Fawcett Publ'ns, Inc.*, 90 N.Y.S.2d 853, 855 (N.Y. Sup. Ct. 1949), *aff'd* 276 A.D. 994 (N.Y. App. Div. 1950) ("The plaintiff corporation may not recover for brokerage

### C.  JLLA provides no persuasive reason to depart from well-established Virginia law

Unable to successfully distinguish *Massie*, JLLA next advances a series of claims that simply disagree with *Massie*'s rationale.  None provides a reason to depart from the jurisprudence of the Virginia Supreme Court.

### 1.  *Massie* is perfectly compatible with the authority of the Virginia Real Estate Board

First, JLLA claims that refusing to enforce the illegally performed contract in this case would "usurp" the Virginia Real Estate Board's power to determine penalties for unlicensed practice.  *See* Brief of Appellant 53–60.  This is the first time JLLA has made that argument; it is not preserved.  *See Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (arguments "never fairly presented below" are not preserved on appeal).

The claim is unpersuasive in any event.  The Board and its predecessor the Virginia Real Estate Commission have had "authority to regulate the real estate professions," Brief of Appellant 54, from the beginning of Virginia's real estate licensing act.  *See* Va. Code Ann. § 4359(79) (1924) ("The commission . . . may do all things necessary and convenient for carrying into effect the provisions of

---

services rendered by one who was not duly licensed to act . . . ."); *Coldwell Banker Mid Plaza Real Estate Inc. v. Guindi*, 889 N.Y.S.2d 881 (N.Y. Sup. Ct. 2009) (same); *Certified Realty Co. v. Reddick*, 456 P.2d 502, 505 (Ore. 1969) (recovery is unavailable under both Oregon and Washington law for services provided by unlicensed employee of licensed brokerage).

this act and may from time to time promulgate necessary rules and regulations.").

The Virginia Supreme Court has never suggested that there is tension between the

Board's authority and the *Massie* rule against enforcing illegal real estate

contracts, and the Court has continued to apply *Massie* for decades. *See Harrison*

*& Bates, Inc. v. LSR Corp.*, 385 S.E.2d 624, 626 (1989).

The logic of *Massie* also forecloses JLLA's claim.  Then, as now,

violations of the licensing laws were punishable by a fine.  *See* Va. Code Ann.

§ 4359(88) (1924).  *Massie* acknowledged as much, but squarely rejected the

argument that the existence of the fine meant that the unlicensed broker could still

enforce the contract.  The Virginia Supreme Court relied on the "general rule"

that

> a contract made in violation of a statute is void, and
> there can be no recovery thereon, unless it is apparent
> from the statute that the legislature did not intend to
> make the contract void and unenforceable, but simply to
> leave those violating its provisions amenable to its
> penalties.

3 S.E.2d at 180.

That remains true now.  JLLA points to no language in the current statutes

governing the Board that could indicate any "intention to treat the contract as

valid and enforceable between the parties."  *Id.*  But *Massie* treats the

unenforceability of an unlicensed broker's commission agreement as a mere

"ordinary consequence of his illegal acts."  *Id.*  And after *Massie*, there would be

an especially high bar for finding that the General Assembly desired to enforce contracts involving unlicensed real estate practice because the legislature "is presumed to know the law as [the Virginia Supreme Court] has stated it and to acquiesce therein, and if the legislature intends to countermand such appellate decision it must do so explicitly." *Weathers v. Commonwealth*, 553 S.E.2d 729, 730 (Va. 2001). Nor does JLLA cite any indication that the Board itself considers the *Massie* rule an infringement on its jurisdiction. The district court's decision is perfectly compatible with the Board's authority.

**2.    There is no thumb on the scales in favor of parties who fulfill bargains by breaking the law**

JLLA next suggests that this Court should put a thumb on the scales in favor of enforcing debatably illegal contracts. Brief of Appellant 58–59. Even if a "tie goes to the lawbreaker" standard were appropriate, it surely would make no difference here, where the Virginia Supreme Court has already made abundantly clear that the provision of unlicensed real estate services is illegal and grounds for not enforcing the contract. *See Massie*, 3 S.E.2d at 180; *Harrison & Bates*, 385 S.E.2d at 626.

In truth, neither of the cases cited by JLLA suggests that any heightened standard would be appropriate here. *Smithy Braedon*, of course, involved no illegality of any sort because the unlicensed co-broker neither performed nor

42

promised to perform any services requiring a license.  825 F.2d at 791.  No thumb

on the scales was necessary to find that that contract was enforceable.   And

*Wallihan v. Hughes* addressed a judge-made public policy against contracts that

facilitate divorce before the couple has separated.  82 S.E.2d 553, 558 (Va. 1954)

(citing *Cumming v. Cumming*, 102 S.E. 572, 574–575 (Va. 1920)).   That sort of

public policy may indeed present a danger of vagueness and variability

warranting skepticism.  *See, e.g.*, *Bailey v. Bailey*, 12 Va. Cir. 67, 70 (1987) (with

respect to *Cumming*, "[o]f course, it should be noted that 'no fault' did not exist in

1920").   But that skepticism is unwarranted when a *statute* is the basis for a

contract's illegality.    The Virginia Code explicitly prohibits unlicensed

individuals from acting as real estate salespersons, and has done so for nearly a

century.  *Massie* is not the latest fashion craze.

### 3.    Free-floating equitable principles do not support JLLA

JLLA concludes with a naked plea to apply "principles of equity," without

regard for this Court's obligation to apply the jurisprudence of the Virginia

Supreme Court.  *See Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs.,*

*Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).  But free-floating equitable principles are

not relevant to this contract action because "when illegality is raised, it is the

interest of the public, rather than the equitable standing of the parties . . . that is

important."  5 Williston on Contracts § 12:4 (4th ed.).  The Virginia Supreme Court has already weighed the equities when it comes to contracts involving unlicensed real estate salespersons, and those equities do not favor JLLA.  *See, e.g.*, *Harrison & Bates*, 385 S.E.2d at 626 ("Although we recognize the apparent hardships sometimes resulting, we have consistently held that the courts will not aid a party to enforce an agreement made in furtherance of acts made illegal by the statutes."); *see also* Restatement (First) of Contracts § 598 cmt. a (1932) ("When relief is denied it is because the plaintiff is a wrongdoer, and to such a person the law denies relief.").  JLLA's plea for equity boils down to a plea to disregard *Massie*—a plea foreclosed by *Erie R.R. Co. v. Thompkins*, 304 U.S. 64 (1938).

Even if principles of equity were relevant, none would be more relevant than the doctrine of unclean hands: "He who asks equity must do equity, and he who comes into equity must come with clean hands."  *Firebaugh v. Hanback*, 443 S.E.2d 134, 138 (Va. 1994).  It was JLLA's own employee who performed the illegal services, with JLLA's full knowledge.   And Virginia's licensing act charges JLLA with responsibility for preventing that sort of unlicensed practice.  *See supra* at 35.  JLLA is not an innocent party when it comes to Turowski's illegal turn as a real estate salesperson.

Finally, JLLA also dirtied its hands by disregarding its duties to Hoffman of honesty and fair dealing. In particular, JLLA used bait-and-switch tactics that led Hoffman to expect far lower commission rates than JLLA ultimately planned to charge. The bids that Turowski submitted for the Fish & Wildlife Service lease on Hoffman's behalf stated that JLLA would be entitled to a one percent commission. JA 1543. It is undisputed that Turowski was aware that the bids (and Hoffman's cost assumptions) reflected that commission. JA 1566–67. Turowski nevertheless planned, without informing Hoffman, to double that commission should Hoffman win the Fish & Wildlife Service lease. JA 1566. This was hardly the work of a rogue employee; the Rule 30(b)(6) witness for JLLA testified that those tactics were perfectly consistent with its corporate policies. JA 1068–70. Even if equity were relevant to a broker's inability to recover for unlicensed services, JLLA would not have the clean hands necessary to invoke it.

## CONCLUSION

For these reasons, the defendants request that this Court affirm the judgment of the district court.


Dated: October 27, 2014

Respectfully Submitted,

/s/ John D. Adams

John D. Adams
Brian D. Schmalzbach*
MCGUIREWOODS LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219
Tel: (804) 775-1000
*Not admitted in Virginia

Jodie N. Herrmann
MCGUIREWOODS LLP
Fifth Third Center
201 North Tryon Street
Suite 3000
Charlotte, North Carolina 28202
Tel: (704) 343-2000

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> • This brief contains 10,429 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) because:

> • This brief has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.

/s/ John D. Adams
John D. Adams

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2014, I electronically filed the

foregoing Brief of Appellees with the Clerk of this Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

Thomas J. Cawley
Stephen M. Sayers
Julie M. Peters
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
Telephone: (703) 714-7400
Facsimile: (703) 714-7410
tcawley@hunton.com
ssayers@hunton.com
jpeters@hunton.com

/s/ John D. Adams
John D. Adams